**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Charles Benjamin, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| vs. | ) | |
| | ) | |
| Ward County, | ) | Case No. 4:12-cv-028 |
| | ) | |
| Defendant. | ) | |

Before the court is a renewed motion for summary judgment by Ward County and nominally "John Doe." (Doc. No. 92). For reasons discussed later, the court will treat this action as being against Ward County only, and the renewed motion for summary judgment will be granted. Unless otherwise indicated, the facts relied upon by the court are either undisputed, have not been sufficiently controverted, or favor Benjamin.

## I.    BACKGROUND

### A.    Procedural background

Benjamin initiated this action by filing a *pro se* complaint against Ward County and "John Doe," in his individual and official capacity, alleging violations of the Eighth and Fourteenth Amendments with respect to his treatment while a pretrial detainee in the Ward County Jail during which he became infected with the MRSA virus. (Doc. No. 8). Initially, the court denied Benjamin's request for a court-appointed attorney. However, after an initial motion for summary judgment was filed, the court reconsidered and appointed counsel. (Doc. No. 79). The court then held a telephonic conference with the parties and established new deadlines for completion of discovery, pretrial motions, and the filing of any new or renewed dispositive motions. (Doc. Nos.

87 & 89). Also, at the same time, the court denied without prejudice the blizzard of motions that had been filed by Benjamin and indicated in its order that new motions could be filed by counsel after separating the wheat from the chaff. (Doc. No. 88). Later, after discovery with respect to the merits, Ward County and "John Doe" renewed their motion for summary judgment. (Doc. No. 92).

Somewhat complicating this matter now is that, even though Ward County alleged the defense of failure to exhaust administrative remedies in its answer, both parties proceeded to litigate the merits. In fact, Ward County never mentioned the defense in its initial motion for summary judgment and, even now, gives it only perfunctory treatment at the end of its opening brief after addressing at length why there should be a merits dismissal. (Doc. Nos. 51-52 & 92-93).

B.     **Ward County Jail's policies covering medical services and communicable diseases**

1.     **Medical Services**

During the time of Benjamin's incarceration in the Ward County Jail, it had a written policy for providing medical services that was approved by the Ward County Commission. (Doc. No. 54-2). At the beginning of the policy, there is a statement of general provisions that includes:

1.     No staff member will deny an inmate's right to medical services or care.

* * * *

4.     Medication and treatment will be administered as directed by the Health Care Administrator, or his/her designee.

* * * *

(Id. at p. 3). The policy then goes on to differentiate between "emergency medical procedures" (*i.e.*, those that require immediate care) and "non-emergency medical services." The former are required in "emergency situations," which are defined as:

2

Any health/life threatening condition, such as severe bleeding, unconsciousness, serious breathing difficulties, head injury, severe pain, suicide attempt, on-set of bizarre behavior, severe burns, medication reaction or anaphylaxis.

(Id. at p. 6).  For non-emergency situations, medical care is limited to a once-a-week sick call.

(Id. at pp. 7-8).

The policy further provides that prisoners can request medical care by completing a medical care request form.  When an inmate submits a request for medical care, the policy provides that:

4.      The shift supervisor will relay medical requests to the Health Care Administrator or his/her designee when they are of an emergency nature.  If they are of a non-emergency nature, the shift supervisor will set the inmate up for the next scheduled sick call day.

(Id. at p. 8).

For both emergency and non-emergency care, the policy requires that the shift supervisor must "ensure that the instructions of the physician are followed." (Id. at p. 8).  Also, when a physician requires that the inmate be taken to the emergency room or a specialist, the escorting officer must obtain from the doctor a "Sick/Injured Prisoner Report Form."  (Id. at p. 8).

## 2.      Communicable diseases

Ward County Jail also had a separate policy governing communicable diseases that similarly had been approved by the County Commission.  The policy defined communicable diseases to include: "Any virus . . . that can be easily transmitted from one person to another." (Doc. No. 100-1, p. 1).

Under the policy, inmates suspected to have communicable diseases are to be isolated.  In addition the policy requires:

5.      The cell area will be thoroughly scrubbed with water and a cleaning agent *when the inmate is removed*.  This cleaning will include washing mattresses, bunks, toilets, walls, and floors of the cell occupied by the inmate.

(Id.) (emphasis added).  With respect to the cleaning agent, the policy further states:

> 4.    The North Dakota State Health Department recommends that a freshly
>       prepared solution of one part household chlorine bleach and nine parts water
>       be utilized for cleaning contaminated areas.

(Id. at p. 2).

### C.    Benjamin's knee becomes infected and the claimed failure to provide medical attention until he was seen on sick call on March 31, 2010

#### 1.    What Benjamin claims

Benjamin was admitted to the Ward County Jail on  February 3, 2010, as a pretrial detainee.

(Doc. No. 93-1, p. 13).  In his most recently filed affidavit, Benjamin claims he first noticed a sore

on his left knee on or about March 25, 2010, "which had blistered and then busted."  He claims the

area was hot and caused him extreme pain, making it  difficult for him to walk.  He also claims he

began experiencing a fever and chills.  (Doc. No. 99, p. 2).

Benjamin further claims in his affidavit that he told Jail staff about his condition on several

occasions as it worsened in terms of the pain, heat, swelling, and leaking of puss, but that they

refused him medical treatment, stating he had to wait until the scheduled day for sick call, which was

Wednesday, March 31.  Benjamin claims that, on Sunday March 28, 2010, he submitted both a

written request for medical care and a grievance for the Jail's failure to provide medical attention.

(Id. at pp. 2-3).

#### 2.    What Ward County claims

Benjamin's account is disputed by Ward County both as to the claimed severity of his

condition prior to his seeing the doctor at sick call and as to whether he ever submitted a grievance.

With respect to Benjamin's condition, Ward County points to his written request for medical care

submitted on March 28, which stated merely that he was experiencing sharp pain in his back and

4

legs and had a swollen and red kneecap with no mention of the pain being severe, the wound leaking puss, or that he was experiencing fever and chills. (Doc. No. 54-3). They also point to two medical records from Trinity Hospital that recount what Benjamin later said about the history of his condition. The first is a March 31, 2010, report of the emergency room physician stating that Benjamin had the sore on his knee for about a week and that it had been getting worse, including drainage and chills. (Doc. No. 54-5, p. 1). The second is a report of the doctor who admitted him to the hospital, which states: "He [Benjamin] mentioned that he did have a sore over his right knee for almost a week and for the *last 2 days* the sore has been getting worse." (Id. at p. 5) (italics added).

The record also reflects a third report that was made by the surgeon who saw him on the same day as the emergency room physician and the admitting doctor. Although this report was not cited by Ward County, it too is arguably consistent with its version of what transpired. In the history portion of the report, the surgeon states: "He [Benjamin] presented with a 1 week history of left anterior knee pain, swelling, and in the past few days he noticed drainage." (Id. at p. 8). Then, in the portion of the report entitled "Physical Examination," the surgeon notes that he was able to move his [Benjamin's] left knee to flexion/extension "with minimal discomfort." (Id. at p. 9).

With respect to Benjamin's claim that he filed a grievance on March 28, 2010, Ward County points to what it contends was contrary testimony by Benjamin in his deposition. The import of that testimony (which is set out in detail later) was that he asked for a grievance form, was told he had to follow the procedure for making a request for medical relief, and was provided a form for that instead.

What Ward County contends actually happened prior to Benjamin being seen by a doctor

at sick call was that he submitted a request for medical care on Sunday, March 28, which was reviewed by the shift supervisor to ascertain whether the condition warranted immediate attention. And, since it appeared there was no emergency based on what Benjamin reported, he was added to the sick call list to be seen on the following Wednesday, which was the normal day for sick call. (Doc. No. 53, p. 1). Ward County further contends that Benjamin never advised Jail personnel after he submitted his written request for medical care that his condition changed and, as already discussed, that he did not submit a written grievance.

### D. The examination by the doctor during sick call

Benjamin was seen on Wednesday, March 31, 2010, during sick call by Dr. Schmidt. After observing the condition of Benjamin's left knee, Dr. Schmidt determined he should be taken to the emergency room for knee-draining. (Doc. Nos. 54-1, p. 4; 54-3). Benjamin was transported to the emergency room at Trinity Hospital the same day.

### E. Benjamin's admission to the hospital for debridement of the infection, the positive test for the MRSA virus, and his week long stay in the hospital

Benjamin was first seen by Dr. Olson in the emergency room. In addition to what was noted in his patient history as recounted earlier, Dr. Olson characterized the infected area as cellulitis with pain, swelling, redness, and drainage. He also noted that Benjamin had symptoms of chills/rigors. He then summarized: "The degree of symptoms is severe." (Doc. No. 54-5, p. 1).

Benjamin was immediately admitted to the inpatient unit of Trinity Hospital where he was seen by Dr. Farah, a Trinity Hospital physician, and scheduled for surgery for debridement of the infected area by Dr. Benaissa, an orthopedic surgeon. (Doc. No. 54-5, pp. 4-8). The surgery was performed the same day. (Doc. No. 54-5, p. 10). A culture taken at that time of the surgery tested positive for MRSA. (Doc. Nos. 54-7; 54-12).

Following the surgery, Benjamin remained in the hospital for approximately a week. The record does not reflect, and the court assumes for purposes of what follows, that Benjamin was not under guard during the time he was in the hospital.

On April 7, 2010, Benjamin was discharged from the hospital and returned to the Ward County Jail. (Doc. No. 54-7).

**F.      Evidence of violations by the Ward County Jail staff of the doctor's discharge instructions and its own Jail policies**

**1.      Discharge information and instructions**

The medical records reflect that Benjamin was discharged with the following instructions and information: (1) "close outpatient infectious disease and surgical follow up" (Doc. No. 54-6, p. 3); (2) daily return for a change of wound dressings to the surgeon's office during the week and the emergency room on weekends (Doc. Nos. 54-4, pp. 2-4; 54-7, p. 1; 54-11, p. 2); and (3) written information about MRSA (Doc. No. 54-4, pp. 9-11). The medical records indicate that the discharging physician "discussed with the warden who is currently guarding the patient about my discharge instructions." (Doc. No. 54-7, p. 2).

In addition to discharge instructions being verbally communicated to whomever from the Jail was there to take custody of Benjamin, the requirement for a daily change of dressing and the reason for it were clearly spelled out on the form that the Jail's policy required be completed, which was its "Ward County Jail Sick/Injured Prisoner Report." (Doc. No. 54-11). Also, near the bottom of the form, the following question was posited in bold and capital letters:

**IS THERE ANY REASON THAT THIS INMATE'S CONDITION WOULD BE ENDANGERED BY BEING HELD IN WARD COUNTY JAIL?**

And, in the space below where the physician was directed to check "yes" or "no," the discharging

physician checked "yes" and handwrote in the following note: "for Bacterial Resistant Infection (MRSA)." (Id. at p. 2).

Further, in addition to the discharge instruction specifically mentioning "infectious disease," the information sheet provided with the discharge instructions stated, among other things, the following with respect to MRSA:

> Staph bacteria and MRSA can spread among people having close contact with infected people. MRSA is almost always spread by direct physical contact, and not through the air. Spread may also occur through indirect contact by touching objects (i.e., towels, sheets, wound dressings, clothes, workout areas, sports equipment) contaminated by the infected skin of a person with MRSA or staph bacteria. It is frequently seen in schools, restaurants, health clubs, cruise ships and anyplace where many people gather together.

(Doc. No. 54-4, p. 10).

In short, there is no question that the Jail was advised verbally and in writing on its own form that Benjamin had a virus that was communicable, i.e., a disease within the definition of its communicable disease policy. How much of the discharge instructions and information was shared with Benjamin may be disputed, however. Benjamin claims the information was given only to Jail personnel. (Doc. No. 99, pp. 3-6).

### 2. Evidence of violation of the doctor's discharge instructions and the Jail's medical services and communicable disease policies

#### a. Missed daily changes of dressings

It is undisputed that the Jail did not return Benjamin for daily changes of his dressing as directed by the discharging physician. Rather, it let two successive days pass without a change of dressing - April 17 and April 18 (which were a Saturday and Sunday) - purportedly due to the lack of staff to transport Benjamin for a dressing change on those days. (Doc. No. 65-7, p. 3). Arguably, this violated that portion of the Jail's medical service policy requiring that a doctor's instructions

be followed.

**b.  Lack of compliance with the communicable disease policy**

It also appears that Jail personnel made no affirmative effort to clean Benjamin's cell and bedding before his return following his first surgery and hospital stay per the requirement of the communicable disease policy that this be done after an inmate, who is determined to have such a disease, is removed from his or her cell.  In fact, it appears that Jail personnel simply ignored the communicable disease policy altogether and followed its general policy with respect to cell cleaning, which was that it was up to the prisoner to keep the cell clean using ordinary cleaning supplies furnished by the Jail.[1]  (Doc. No. 54-2, pp. 25-30).  There is some dispute whether these supplies were sufficient for attacking the MRSA virus.

**G.  Course of treatment following missed days of dressing changes and evidence that the MRSA infection had abated**

Although the Jail failed to return Benjamin to either his doctor or the emergency room for dressing changes on April 17 and 18, the Jail did take him back regularly thereafter.  And, on April 27, 2010, Benjamin was seen by Dr. Nwaigwe for a check on his condition.  According to the history of a later report, Dr. Nwaigwe observed no purulent drainage at that time and concluded the wound was no longer infected.  (Doc. No. 54-12, p. 1).

---

[1]  In other words, despite Benjamin having been diagnosed with a highly infectious communicable disease, Jail personnel simply left it up to Benjamin (1) to figure out what level of cleaning and cleaning agents would be appropriate for addressing it, and (2) to actually perform the thorough cleaning the Jail's communicable disease policy required, despite his having just been returned from the hospital with a heavily bandaged knee.  Given the risk posed not only to Benjamin but also to other inmates and Jail staff, it is difficult to understand how anybody in charge with more than two seconds to think about it would have concluded this was a good idea.

### H.   Benjamin's return to the hospital and a second surgery for the MRSA infected area

When Benjamin returned for another examination on April 30, 2010, however, it appeared the MRSA infection had either returned or, perhaps, had never really gone away since by that time he had been off antibiotics for about a week, having been discharged initially with only a two-week course of antibiotics.  (Doc. No. 54-12).

Benjamin was readmitted to the hospital and again placed on antibiotics.  More cultures were taken that confirmed the presence of a MRSA infection.  (Doc. No. 54-13).  Because the antibiotics were not relieving the symptoms, another debridement surgery was performed five days later on May 5, 2010.  (Doc. No. 54-14).

### I.   Benjamin's discharge on electronic monitoring, his state imprisonment, and subsequent surgery for a full knee replacement

Benjamin was discharged from the hospital on May 8, 2010.  (Doc. No. 54-15).  But, instead of being returned to pretrial detention, he was released to home confinement on electronic monitoring because he again needed to return to the doctor daily for a change of his dressing and this time Ward County officials determined this was too much for the Jail.  (Doc. No. 99, p. 6).

There is some indication in the Jail's booking record that Benjamin may have returned to the Ward County Jail on June 22, 2010, for a couple of days.  (Doc. No. 54-1, p. 9).  If so, the court suspects it likely was to await transport to a state prison facility to begin service of his sentence.  However, neither party has addressed whether he in fact returned to the Jail at any point following his second discharge from hospital.[2]

_____

[2] In his affidavit, Benjamin states:  "When I was discharged from the hospital on May 7, 2010, I was ordered on home confinement until I was sent to prison."  (Doc. No. 99, p. 6).  The only thing Ward County states in its brief is that following Benjamin's initial complaint about his lack of immediate medical attention near the end of March, he remained in the Ward County Jail for approximately a month and half.  (Doc. No. 103, pp. 10-11).  In publically

Following his conviction, Benjamin was incarcerated by the State of North Dakota and remained incarcerated through the filing of this action and at least up to the time of the taking of his deposition. It is not clear, however, whether he is now in custody given that his most recent affidavit was sworn to by a Milwaukee, Wisconsin notary.

Benjamin claims he eventually had to have a full knee replacement and this was necessitated by the degeneration of his knee caused by the MRSA infection. (Doc. No. 99, p. 6).

## II.     SUMMARY JUDGMENT STANDARDS

The standards for addressing motions for summary judgment are well known to the court and need not be repeated here. E.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Barnhardt v. Open Harvest Co-op., 742 F.3d 365, 369 (8th Cir. 2014).

## III.    CLAIMS AND DEFENDANTS

The only claims Benjamin pleads are for violations of his civil rights pursuant to 42 U.S.C. § 1983. Further, the only defendant is Ward County. Although Benjamin initially pled a "John Doe" defendant, an appropriate motion to add a named defendant was not made, much less service of process on any such individual to effectively sue him or her in an individual capacity. Hence, the court will address the claims only as to Ward County and order that the case be recaptioned to delete the reference to "John Doe."

Benjamin makes two discrete claims for violation of his constitutional rights, which, in this case, arise under the Due Process Clause of the Fourteenth Amendment given his pretrial status. E.g., Walton v. Dawson, 752 F.3d 1109, 1117 (8th Cir. 2014). The first is for the failure to provide him immediate medical care when he requested it and, instead, making him wait until sick call.

available online records for the state district court, it appears Benjamin's judgment of conviction was entered on June 22, 2010.

Benjamin contends this resulted in his having to endure unnecessary pain and suffering as well as a worsening of his condition that necessitated the first debridement surgery and week-long hospital stay. (Doc. No. 93-1, p. 22).

The second claim relates to what Benjamin contends was a reoccurrence of MRSA after he was returned to the Jail and the resulting second debridement surgery, further pain and suffering, and ultimately a later knee replacement. With respect to this claim, he contends the reoccurrence of the MRSA infection was the result of Jail personnel putting him back into his cell without first thoroughly cleaning both it and his bedding and, perhaps also, their failure to take him for a change of dressing on two successive days contrary to the discharge instructions of his doctor that his dressing be changed on a daily basis. (Id.).[3]

## IV.    THE EXHAUSTION DEFENSE

### A.    Governing law

Congress enacted the Prison Litigation Reform Act of 1995 ("PLRA") to address the problems created by the large number of federal prisoner lawsuits. Among other reforms, the PLRA requires that prisoners exhaust prison grievance procedures before filing suit and an early screening of prisoner complaints by the court at the time of filing. 42 U.S.C. § 1997e(a); 28 U.S.C. § 1915A. See Jones v. Bock, 549 U.S. 199, 216-17 (2007) ("Jones"). The PLRA's exhaustion requirement reads as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

---

[3] While Benjamin in his deposition blames Ward County for his having contracted MRSA in the first instance, his complaint is limited to the two claims set forth above, even affording it a broad construction. (Doc. No. 8). Also, he appears to acknowledge this in his deposition testimony. (Doc. No. 93-1, p. 22).

42 U.S.C. § 1997e(a).

The Supreme Court has concluded that: (1) § 1997e(a) requires "proper exhaustion," *i.e.*, prisoners must complete the administrative process in accordance with the procedural rules set forth by the prison before suing, Woodford v. Ngo, 548 U.S. 81, 88 (2006) ("Ngo"); (2) prisoners must exhaust available administrative remedies even if they do not provide for the exact relief the prisoners want to sue for, Booth v. Churner, 532 U.S. 731 (2001) ("Booth"); and (3) failure to exhaust is an affirmative defense that must be pled and proved by the defendant, Jones, 549 U.S. at 216-17.

When the exhaustion defense has been properly raised, the Eighth Circuit has stated that the district court is "obligated" to determine whether or not the administrative remedies have been exhausted. Chelette v. Harris, 229 F.3d 684, 688 (8th Cir. 2000). And, if they have not, the court is to dismiss the unexhausted claims *without prejudice*. See, e.g., Barbee v. Corr. Medical Services, 394 Fed. App'x 337, 338 (8th Cir. 2010) ("Barbee") (unpublished per curiam) (concluding the district court erred in entering summary judgment of dismissal with prejudice on the merits for three defendants where it was clear there had been a failure to exhaust and remanding for dismissal without prejudice as to those defendants); Davis v. Harmon, 389 Fed. App'x 587, 587-88 (8th Cir. 2010) ("Davis") (unpublished per curiam) (concluding the district court erred in dismissing the complaint on the merits where the record was clear there had been a failure to exhaust and amending the dismissal to be without prejudice). Whether these rules apply in all instances will be addressed later.

B.    **Ward County's grievance policy**

Because it is the prison's policy that defines the procedural requirements that the prison and

the prisoner are required to follow in terms of the exhaustion of the administrative remedy, Jones,

549 U.S. at 218, it is necessary to consider the following relevant parts of Ward County's grievance

policy:

> **POLICY:**     Inmates shall be allowed to file grievances without fear of reprisals
> to ensure inmates rights in accordance with NDCC and NDJR.

> **GENERAL INFORMATION:**

> 1.    The grievance committee will consist of the Jail Commander, a Shift
> Supervisor, and a Correctional Officer.

> 2.    The inmate filing the grievance may be allowed to attend the
> grievance committee's review of his/her complaint.

> **PROCEDURE A.**    INTERNAL GRIEVANCES

> 1.    Inmate complaints will first be acted on informally to resolve a
> problem or complaint by the duty correctional officer.

> 2.    If the complaint is not resolved to the inmates satisfaction, the inmate
> may file an INMATE COMPLAINT FORM.  The shift supervisor
> will investigate the circumstances surrounding the inmate's
> complaint and file a written answer to the inmate.  If the inmate is
> still not satisfied, he/she may then file an INMATE GRIEVANCE.

> 3.    The on duty correctional officer will provide the inmate with a
> grievance form when requested by the inmate.

> 4.    The correctional officer will deliver the completed form without
> alteration, interference, or delay when received, to the shift
> supervisor.

> 5.    The shift supervisor will ensure that the grievance is investigated
> personally as soon as possible after receiving the grievance form.

> 6.    The shift supervisor will submit a written report of his/her findings
> within three (3) days of the receipt of the grievance, to the grievance

committee.

7.     The shift supervisor will conduct an investigation, immediately, upon receipt of a grievance when it is of an emergency nature in the Ward County Jail.

8.     The shift supervisor will submit a written report of findings and/or action taken within twenty-four (24) hours to the jail commander of all emergency classified grievances.

9.     The shift supervisor will provide the reporting inmate with a written copy of his/her findings, recommendations, date and time grievance committee will review grievance upon completion of the investigation in the jail facility.

10.     The grievance committee will:
    (a)     Review the investigation and finding;
    (b)     Hear any information and rebuttal from the inmate;
    (c)     Discuss corrective plans and action with the shift supervisor and inmate;
    (d)     Decide on plan of action to be implemented;
    (e)     Instruct the shift supervisor on what plan to implement for corrective action and have him/her report the results within (30) days.

11.     The jail commander will complete the jail facilities grievance form after the committee has made its decision. It shall include:
    (a)     The review of the complaint;
    (b)     The decision made by the committee;
    (c)     Justification for the decision;
    (d)     The corrective plan of action taken.

12.     The jail commander will place the answered grievance in the inmate's file.

(Doc. No. 54-2, pp. 1-2).

### C.    Benjamin's argument that exhaustion was not required because no administrative "process" was available either by its terms or by reason of the conduct of Jail officials

#### 1.    The claimed failure to provide prompt medical care and making him wait three days until sick call

Because Benjamin is making separate claims for violation of his due process rights, it is necessary to consider Ward County's defense of failure to exhaust with respect to each of the claims. See, e.g., Jones, 549 U.S. at 219-24; Abdul-Muhammad v. Kempker, 486 F.3d 444, 445-46 (8th Cir. 2007).

Starting first with his claim that Ward County Jail personnel violated his rights by not providing immediate medical care and making him wait until sick call, Benjamin claims in an affidavit submitted following his deposition testimony:

> 11.    On March 28, 2010, I completed a written grievance based on jail's refusal to provide medical care to me and I also completed a written medical care form.  A copy of the medical form was submitted by Ward County.

(Doc. No. 99, p. 3).  The most straightforward reading of this statement is that Benjamin is claiming he submitted a request for medical care and a separate written grievance.

Ward County's response is twofold.  The first is the assertion in its brief that there is no evidence a written grievance exists.  But, aside from Benjamin's deposition testimony that might be read to support this, as discussed in a moment, Ward County has not proffered other evidence to prove the non-existence of a filed grievance, such as an affidavit from a person with knowledge of the Jail's records stating that it retains copies of grievances going back to the relevant time period and that a diligent search failed to disclose any record of a written grievance by Benjamin.

Ward County's second response is that Benjamin's affidavit testimony that he submitted a written grievance is contrary to his earlier deposition testimony.  On that score, Benjamin's complete

deposition testimony touching upon the subject of exhaustion is the following:

Q.      Okay.  This is the first -- 3-28 of '10 is the first time that you brought to anyone at Ward County's attention that your knee hurt; is that correct?

A.      Right.

Q.      Okay.  Now, you gave this to an officer; is that right?

A.      Yes.

Q.      Tell me how that went.

A.      I asked them for a grievance form.  They told me I couldn't fill out a grievance form.  I had to go through the steps.  They told me -- I showed them my knee.  They told me in order for me to get help, I have to fill out a request for medical care.  So I did that.

Q.      Before you filled out this form, you asked for a grievance form?

A.      Yes.

Q.      Why did you want a grievance form?

A.      Because I had talked to them about my knee before I did this.  I showed them my knee.

Q.      Who did you talk to?

A.      Whoever the lady was or dude was.  I don't remember.

Q.      When was that?

A.      I don't know.

Q.      Was it the same day?

A.      Probably so, or a day before, something like that.  They said there wasn't nothing they could do.  They told me if it busts to let them know right away.

Q.      You mean if the –

A.      If the little white bump busts, to let them know.

Q.  All right.  Let me get this straight now.  Sometime before you filled out this form, which was on 3-28 of '10, probably the same day, you brought your knee problems to the attention of Ward County for the first time; is that correct?

A.  Yes.

* * * *

Q.  So then they said you have to fill out this form; is that right?

A.  Yes.

Q.  And you did that right away?

A.  Yes.

Q.  And they brought you the form right away; correct?

A.  No, they never brought me the form back.  When I filled it out, I didn't see it until –

Q.  No, no.  They told you you had to fill out a medical request form?

A.  Yes.

Q.  They brought that form to you to fill out right away?

A.  Not right away.

Q.  How long was it?

A.  They probably did it the same day but not right away.

Q.  And then you filled out the form?

A.  Yes.

Q.   And you turned it back in to them?

A.  Yes.

* * * *

Q.  You're familiar with the forms that are used at the Ward County Jail

to request medical care or to complain about a condition; am I right?

A.    Yes.

Q.    Have you ever asked for any forms - have you ever asked Ward County for any forms and have they ever denied you any forms?

A.    They denied me a grievance.

Q.    And that was when you wanted medical care?

A.    Right.

Q.    And they gave you the medical care request slip?

A.    Right.

Q.    Okay.  Were you confused about the process that you needed to go through to get medical care?  Is that why you asked for the grievance before the medical care slip?

A.    I asked for a grievance because I wanted help for my knee.  And I had to wait three days, and I didn't want to suffer for three days.

Q.    You asked for a grievance before you filled out the request for medical care slip though; correct?

A.    Right.

Q.    Other than that, had you ever been refused a form that you asked for from the Ward County Jail?

A.    No.  I didn't ask for nothing.

(Doc. No. 93-1, pp. 16-20).

Given the foregoing, there are several possibilities.  The most unlikely is that Benjamin submitted a separate written grievance.  However, a close reading of his deposition testimony does not absolutely foreclose that possibility.  Although Benjamin testified he did not submit a separate written grievance when he first requested medical attention, purportedly because he was not given

one and was told he had to fill out the forms requesting medical care instead, the questions and answers having to do with what happened after that focused only on the medical care form leaving open the possibility he later submitted a written grievance.

Another possibility is that Benjamin did not submit a separate written grievance and his later affidavit testimony about having done so was either untruthful or an inartful attempt on his part to suggest that he considered the medical request form to be both a request for medical care and a grievance. Still another possibility, given what may be the conflicting accounts by Benjamin, is that he was untruthful in his affidavit testimony about having submitted a written grievance as well as in his earlier deposition testimony that he requested a grievance form and was denied one.

Without referencing either the affidavit or deposition testimony, Benjamin's attorneys appear to concede in the briefing that Benjamin did not submit a separate written grievance. Rather, they contend that the reasons why he did not was because he was denied a grievance form and misled into believing that the only thing he could do was make a written request for medical services. (Doc. No. 97, pp. 6-7).

Ward County, on the other hand, while contending that Benjamin did not submit a written grievance, appears to accept his testimony that he raised the subject of filing a grievance with Jail staff. Ward County argues that this amounted to nothing more than Benjamin making an informal complaint under the Jail's grievance policy and that, when this failed, Benjamin was obligated to properly exhaust the remainder of the process by first submitting a written complaint and then, if necessary, a written grievance. (Doc. No. 103, pp. 10-11).

Benjamin's possibly inconsistent accounts give cause for concern. However, when construing the present record in his favor, the court cannot eliminate at least the possibility that he

attempted to grieve the failure to provide him medical care and was prevented from doing so by the Jail's correctional officer telling him he could only follow the medical care request procedure and refusing to provide him with the necessary form for making a formal complaint. If so, this may be enough to excuse Benjamin from having to exhaust this claim depending upon how the evidence plays out, including whether the court concludes Benjamin's deposition account is credible as to whether he asked for a grievance form and was denied one. Compare, e.g., Spada v. Martinez, 579 Fed. App'x 82, 86 (3d Cir. 2014) ("In sum, a factual question exists concerning whether SCI–Graterford officials refused to provide Spada with grievance forms, thereby rendering the grievance process unavailable to him within the meaning of § 1997e."); Miller v. Norris, 247 F.3d 736, 738-40 (8th Cir. 2001) (same); Kantamanto v. King, 651 F. Supp. 2d 313, 324 (E.D. Pa. 2009) (same); with Gibson v. Weber, 431 F.3d 339, 341 (8th Cir. 2005) ("An inmate's subjective belief that the procedures were not applicable to medical grievances 'does not matter' and is not determinative.").

Consequently, the court concludes further proceedings would be required to resolve the issue of whether Benjamin properly exhausted his claim that he should have been provided immediate medical care and not forced to wait until sick call. See Miller v. Norris, supra.[4]

---

[4] The further proceeding that would be required is an evidentiary hearing where the court would consider the evidence and render a decision. Because the court is obligated to consider the issue when it is raised, the court may not defer the issue to trial. Also, there is no right to a jury determination. See, e.g., Small v. Camden County, 728 F.3d 265, 269-71 (3d Cir. 2013); Pavey v. Conley, 544 F.3d 739, 740-42 (7th Cir. 2008); Chelette, 229 F.3d at 688 (concluding that the procedures outlined in Osborn v. United States, 918 F.2d 724, 729-30 (8th Cir. 1990), for the court resolving disputed facts over subject matter jurisdiction apply for resolution of failure-to-exhaust issues).

2. **The misconduct allegedly causing a return of the MRSA infection, a second hospitalization and debridement surgery, and much later a full knee replacement**

a. **Failure to clean Benjamin's cell and bedding**

Benjamin claims that the Ward County Jail officials were deliberately indifferent when they failed to clean his cell and bedding *properly* (that is a cleaning by persons who knew what they were doing and using the proper cleaning agents) and *prior to* his being returned to the cell, thereby subjecting him to the very real possibility of reinfection of the MRSA virus - assuming he had it before he was taken to the emergency room following sick call. Benjamin claims he was unaware that this needed to be done in part due to his lack of understanding at the time about how MRSA acted and also in part because the information provided by the discharging physician about MRSA was given only to the Jail officials and not him. (Doc. Nos. 93-1, pp. 19-22; 99, pp. 3-5). He also claims he reasonably relied upon what the Ward County Jail insisted be done at that point, which was making him responsible for his own cell cleaning. (Doc. No. 93-1, p. 22).[5] Assuming these facts to be true, Benjamin appears to have a good argument that he could not have been expected to grieve what he did not know about either in terms of the Jail's problematic conduct or his having suffered an injury. Cf. White v. Garrison, 70 F.3d 1276 (8th Cir. 1995) (unpublished table opinion) (accrual of civil rights action is governed by federal law and determined by when plaintiff knew or had reason to know of harm constituting a basis for an action).

Obviously, at some point Benjamin knew or should have known, but when that would have been appears to be a fact question that needs to be resolved. And, the reason why this is significant

_____

[5] As to that, Ward County is in a poor position to contend otherwise since, even it is briefing here, it attempts to defend that its general policy of having prisoners be responsible for their own cell cleaning was sufficient in this instance. (Doc. Nos. 53, p. 2; 93, pp. 9-10, 13).

in this case is because, if Benjamin could not have been expected to grieve the Jail's questionable conduct while he was in custody prior to being taken to the hospital a second time (where he learned the MRSA virus was back or had not been abated), this raises the further question of whether the Jail's grievance procedure was available to a person who no longer was a prisoner in the Jail, given the uncertainty whether Benjamin ever returned, or if he did for a day or so just prior to being sent to prison, whether he knew or should have known enough at that point to have been expected to implement the grievance policy. Notably, the Jail's policy generally makes mention only of "inmates" being able to avail themselves of the grievance policy and does not say the process would have been available to a person who is no longer a prisoner in the Jail. See Parks v. Dooley, No. 09-3514, 2011 WL 847011, at *17 (D. Minn. Feb. 11, 2011) (concluding that similar language indicated the grievance procedure was not available to a person who no longer was an inmate). Also, it appears that seeking informal resolution of a problem with a "duty correctional officer" is a mandatory step prior to being able to proceed further, and it is not clear how this would have been accomplished by a person who was not in the Jail. Finally, even after an attempt at informal resolution, the policy requires the use of the Jail's forms, first for making the required written complaint and then later filing a grievance, and there is no indication that these would have been made available to a person who no longer is a prisoner in the Jail much less that they would have been acted upon.[6]

---

[6] Likewise, there is nothing in the Jail's grievance policy that suggests that its grievance procedures are available to inmates who end up in one of the state's prisons. Those cases holding that prisoners transferred to another facility are still expected to exhaust available remedies arguably do not apply here since the Ward County Jail is a county-run facility and the institution in which Benjamin ended up following his sentencing was a state facility operated by the North Dakota Department of Corrections and Rehabilitation, which, presumably, has its own grievance policies and procedures. See, e.g., Hartry v. County of Suffolk, 755 F. Supp. 2d 422, 433-35 (E.D.N.Y. 2010) (noting the difference in terms of what might be the requirement for exhaustion for a prisoner transferred to facilities operated by the same governmental entity and those who end up in the custody of a different governmental unit). At the very least, there is a fact question as to whether Benjamin could have exhausted his Jail grievances after he was no longer a prisoner

In short, the court concludes there are disputed facts with respect to whether Benjamin was required to grieve the Jail's failure to take affirmative action with respect to his MRSA infection after he was returned to his cell following his first surgery, including following its own communicable disease policy by cleaning his cell and bedding prior to his return.

b.    The failure to change the wound dressing

A much closer question is presented, however, with respect to Benjamin's claim that Jail personnel acted with deliberate indifference in failing to take him for a change of the dressing on his knee on two successive days despite the instruction of the discharging physician that this had to be done daily. While Benjamin professes that he was ignorant of the discharge instructions (and this contention appears to be plausible with respect to the claim just discussed), it seems less probable that he was unaware of the doctor's instruction that the dressing be changed daily. And, if he was aware, he certainly knew when he was not taken for a change of dressing this was not right, even if he was not fully aware of the potential consequences, either in terms of the MRSA returning or, more simply, the wound not healing properly. Nevertheless, since further proceedings are required to resolve the exhaustion issues with respect to the other interrelated claims, the court will not make a ruling now based on the present record.

D.    Benjamin's argument that exhaustion was not required because no "remedy" was available

1.    Failure to clean Benjamin's cell and bedding

Separate from contending there was no process available to exhaust his claims, Benjamin also claims that there was no remedial relief available - damages or otherwise. With respect to his

there. And, what may be highly probative evidence with respect to that point is whether the Jail can demonstrate it had in fact previously processed grievances for persons who were no longer in its custody.

claim that Jail personnel violated his rights by putting him back into what may very well have been a MRSA-infected environment without a proper cleaning, Benjamin may have a point.

There is nothing in the Jail's grievance policy that empowers its officials to award monetary damages. In fact, the policy suggests that only "corrective action" would be available. Further, the actual policy language aside, it is improbable that Jail officials could obligate Ward County to pay money absent explicit action by the County Commissioners, who are not part of the grievance process.

The mere fact that the monetary damages Benjamin now seeks were not available, however, does not excuse him from exhausting the Jail's administrative remedies. As noted earlier, this was the holding of the Supreme Court's decision in Booth. But Benjamin's point here is that, if damages were not available, then what relief was? As noted earlier, Benjamin's contention with respect to the failure of the Jail to have cleaned his cell prior to his return is that by the time that he figured out he had something to complain about, it was too late in terms of any remedial "corrective action" since the damage had been done, *i.e.*, he had already suffered the reoccurrence of the MRSA infection and was being provided medical treatment. Benjamin cites Booth as authority for his not having to exhaust if no remedial relief was available.

In Booth, the petitioner was a prisoner who filed a civil rights action claiming he had been assaulted by correctional officers and then denied treatment for his ensuing injuries. In his complaint, the petitioner sought money damages along with various forms of injunctive relief, including transfer to another prison. For purposes of the case, the Supreme Court assumed that only the demand for money damages remained, noting there was some confusion as to whether the other requests for relief had been mooted by his subsequent transfer to another facility. 532 U.S. at 734-

35 & n.2.  The Court then stated that the question to be decided was "whether an inmate seeking only money damages must complete a prison administrative process *that could provide some sort of relief on the complaint stated, but no money*."  Id. at 734 (italics added).

It appears the reason why the Court framed the question in this manner was because of how it construed the language of § 1997e(a).  Later in its opinion, the Court stated the following with respect to the concession of the parties that some relief would have to be possible before exhaustion would be required:

> The meaning of the phrase "administrative remedies ... available" [in § 1997e(a)] is the crux of the case, and up to a point the parties approach it with agreement.  Neither of them denies that some redress for a wrong is presupposed by the statute's requirement of an "available" "remed[y]"; neither argues that exhaustion is required where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint.[4]  The dispute here, then, comes down to whether or not a remedial scheme is "available" where, as in Pennsylvania, the administrative process has authority to take some action in response to a complaint, but not the remedial action an inmate demands to the exclusion of all other forms of redress.

532 U.S. at 736.  The Court then added in the accompanying footnote:

> 4. Without the possibility of some relief, the administrative officers would presumably have no authority to act on the subject of the complaint, leaving the inmate with nothing to exhaust.  The parties do not dispute that the state grievance system at issue in this case has authority to take some responsive action with respect to the type of allegations Booth raises.

Id. at n.4.

A number of lower federal courts have pointed to the foregoing language in Booth as requiring that *some* remedy be available for exhaustion to be required, albeit in cases involving circumstances different than this one.  See, e.g., Fletcher v. Menard Corr. Center, 623 F.3d 1171, 1174 (7th Cir. 2010) ("Booth . . . in any event distinguished between a case in which there are remedies but none to the prisoner's liking (which was the Booth case) and a case in which there is

no remedy; for the Court said that 'without the possibility of some relief, the administrative officers would presumably have no authority to act on the subject of the complaint, leaving the inmate with nothing to exhaust.'[citation omitted]"); Kaemmerling v. Lappin, 553 F.3d 669, 675-76 (D.C. Cir. 2008) (citing the foregoing language from Booth and concluding that exhaustion was not required because the federal Bureau of Prisons in that instance lacked the authority to provide any relief as part of its grievance process); Brown v. Valoff, 422 F.3d 926, 935 (9th Cir. 2005) ("Booth made quite clear that the statutory language does not require exhaustion when no pertinent relief can be obtained through the internal process.")

There are, however, Third Circuit cases which appear to suggest that exhaustion is required if there remains any *procedure* that is available, even though no relief could be granted. See, e.g., Williamson v. Wexford Health Sources, Inc., 131 Fed. App'x 888, 890 (3d Cir. 2005) (noting the position of the Seventh Circuit that exhaustion would not be required if the harm is done and no further relief was available, but suggesting that this would not be true in the Third Circuit given its position with respect to futility not being an exception to exhaustion and citing the pre-Booth case of Nyhuis v. Reno, 204 F.3d 65 (3d Cir. 2000)).[7] The reasons for this position (assuming it is in fact the Third Circuit's position) appear to include that: (1) it is in keeping with the statutory language; (2) it promotes the collateral benefits of exhaustion, including creating a better record for subsequent proceedings, discouraging frivolous lawsuits, promoting the prison grievance process as the primary

---

[7] The Supreme Court in Booth did state in a footnote that it would not read a futility exception into the statutory requirement for exhaustion and that "Congress has provided in § 1997e(a) that an inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues." 532 U.S. at 741 n.6. In Fletcher v. Menard Corr. Center, the Seventh Circuit stated that what the Supreme Court said in that regard must be read in the context of what else it had to say in Booth, as set forth earlier, concluding that "futility" is not the same thing as "unavailability." 623 F.3d at 1173-74. The other courts that have similarly read Booth as requiring that *some* remedy be available have apparently concluded the same thing.

dispute resolution mechanism, etc.; and (3) it draws a bright-line rule so that the courts do not have to enmesh themselves in the details of the prison administrative process in terms of trying to decide what relief may be available. See Nyhuis, 204 F.3d at 72-78.[8]

The parties have not cited to any Eighth Circuit case that is directly on point. However, in the *en banc* decision in Lyon v. Vande Krol, the Majority did state:

> It is true that we have held that inmates cannot be held to the exhaustion requirement of the PLRA when prison officials have prevented them from exhausting their administrative remedies. For instance, in Foulk v. Charrier, 262 F.3d 687, 697-98 (8th Cir. 2001), we concluded that the district court lacked a sufficient factual basis to find that an inmate had failed to exhaust his administrative remedies when prison officials had refused to respond to his informal resolution request that he completed to satisfy the requirements of the first part of the prison's three-part grievance process. In Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001), we similarly held that an inmate was prevented from exhausting his administrative remedies when prison officials failed to respond to his requests for grievance forms, and that the inmate's failure to exhaust those remedies was not a bar to suit because they were not "available" to him.

> Though it is the burden of the defendant in a case such as this to show that a plaintiff prisoner failed to exhaust all available administrative remedies under the PLRA, it is not disputed in this case that Mr. Lyon did not exhaust them. Under the PLRA, Booth, 532 U.S. at 737-41, 121 S.Ct. 1819, and all other applicable law, the question is a simple one: Was there a procedure available? There is no question in this case that there was, that Mr. Lyon was aware of it, and that he chose not to follow the steps that the procedure outlined. Mr. Lyon was never told that there was not a procedure, moreover, so there is no basis for the application of an estoppel principle here, even if one might otherwise be available.

305 F.3d 806, 808-09 (8th Cir. 2002) (*en banc*). And, in response, two dissenting judges chastised the Majority for what they perceived to be a misreading of Booth and the adoption of an approach,

---

[8] The first reason may be questionable because what the Supreme Court had to say in Booth appears to have been based on its interpretation of the statutory language. See, e.g., Brown v. Valoff, 422 F.3d at 935 ("Booth's statutory interpretation is dispositive: The obligation to exhaust 'available' remedies persists as long as some remedy remains 'available.'"). Also, with respect to the third reason, courts are required to consider the details and nuances of a prison's grievance policies in any event since, as the Supreme Court made clear in Jones, it is the prison's policy, not the PLRA, that defines the procedures the prisoner must follow in exhausting available administrative remedies.

which, if their characterization of the Majority's decision was correct, would arguably require exhaustion in any case in which the administrative process was available, even though no practical remedial relief could be granted.  Id. at 811 (Bright and McMillian, J.J., dissenting).

While the court's *dicta* in Lyon does raise some question, the case was not on point with respect to the situation here and there was no in depth discussion of Booth, much less an express statement that exhaustion is required in cases where no remedial relief would be available. Consequently, in the absence of something more definitive, the court will follow what the Supreme Court stated in Booth.  And, with respect to Benjamin's claim that the Jail should have cleaned his cell and bedding prior to his return from his first surgery, the court concludes there are fact issues with respect to whether any remedial relief was available at a time when Benjamin knew or should have known about the Jail personnel's problematic conduct.[9]

## 2. Benjamin's other claims

The same cannot be said for Benjamin's other claims, however.  While there may be no remedy available now, there presumably was at the time when Benjamin could have initiated the grievance process.  With respect to his claim that he was not provided treatment soon enough after his infection first started and was made to wait until sick call, assuming the grievance process was available and he had not been blocked from implementing it, an obvious remedy would have been

---

[9]  In this case, damages do not appear to have been available and Benjamin may have a point that it was too late for any other action that could have corrected or mitigated what had already occurred.  But how about the suggestion by the Third Circuit in Nyhuis of the possibility of some more intangible outcome, such as: a declaration that a mistake had been made (thereby providing a moral victory to Benjamin and hopefully advancing the lot of other prisoners going forward); the disciplining of the officers who engaged in the wrongful conduct; or, perhaps, even a simple apology?  204 F.3d at 77.  Are these enough to satisfy what Booth contemplates as some relief or redress being available?  The court thinks not for *this* case given Booth's use of the words:  "relief," "redress for a wrong," "any relief or . . . any action," and "responsive action" in characterizing the relief or remedy that would have to be available.  532 U.S. at 734, 736 & n.4.  But this is by no means clear.  The same is true as to whether any of these more intangible  outcomes were "corrective actions" within the meaning of the Jail's policy that defines the scope of the required exhaustion and were "available."

taking him to see a doctor sooner.  Likewise, with respect to the failure to take him to the doctor on the two days he was not taken for a change of the dressing on his knee, the remedy would have been taking him to the emergency room even if it meant calling in off-duty personnel and paying overtime.

**E.**     **Benjamin's argument that he did not need to exhaust because it was permissive and not mandatory under the Jail's policy**

A final argument that Benjamin makes for why exhaustion was not required was because the language of the Jail's policy made the filing of the written complaint permissive and not mandatory with its use of the word "may."  The same is true for the latter step in the process of filing a written grievance.

Putting aside the fact that the first step of informal resolution appears to be mandatory, the fact that any of the steps may be permissive does not excuse exhaustion.  Rather, the obligation under § 1997e(a) is to exhaust the remedies that are available and the mere fact they are permissive does not render them unavailable.  E.g., Johnson v. Thyng, 369 Fed. App'x 144, 147-48 (1st Cir. 2010) (unpublished per curiam); Owens v. Keeling, 461 F.3d 763, 770 n.4 (6th Cir. 2006); Davis v. Warman, 49 Fed. App'x 365, 367-68 (3d Cir. 2002) (unpublished); Warren v. Fort Dodge Corr. Facility, No. 08-CV-3038, 2009 WL 1473955, at *3 (N.D. Iowa May 27, 2009); Braimah v. Shelton, No. 4:03CV3135, 2005 WL 1331147, at *3 (D. Neb. May 20, 2005).

**F.**     **Must the court resolve the exhaustion issues in this case before proceeding to address and dismiss the case on the merits?**

The Eighth Circuit in Chellette stated that once the issue of failure to exhaust was raised in that case, the court "was obligated to proceed to determine whether in fact [the prisoner] had exhausted his administrative remedies."  229 F.3d at 688.  Whether Chelette in so stating laid down

a rule that applies in all cases will be returned to later. However, to frame the issue, it is important to note that the court in making that statement cited the Seventh Circuit's decision in Perez v. Wisconsin Dep't of Corrections, 182 F.3d 532 (7th Cir. 1999) ("Perez"), where the Seventh Circuit stated that, for the exhaustion requirements of § 1997e(a) to operate properly, a district court must address and resolve disputes about its application before turning to other issues. The Perez court stated:

> But it does not follow from treating § 1997e(a) like a statute of limitations that courts may choose to ignore it. Judges can't ignore statutes of limitations, either. When there are multiple grounds for dismissing a suit (as opposed to deciding it on the merits), courts may select from among them. Cf. Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999). Thus a court might properly dismiss a suit such as this to the extent it seeks relief against the Wisconsin Department of Corrections by observing that § 1983 does not authorize litigation against states and their agencies. See Will v. Michigan Department of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). But the court must not proceed to render a substantive decision until it has first considered § 1997e(a). The statute gives prisons and their officials a valuable entitlement—the right *not* to face a decision on the merits—which courts must respect if a defendant chooses to invoke it. That's the point of Hallstrom and McNeil, neither of which the fifth circuit mentioned in Underwood. Congress did not authorize bypass along the lines of 28 U.S.C. § 2254(b)(2), which says that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." Courts should not act as if every exhaustion requirement had its own § 2254(b)(2). Section 1997e(a) has a very different structure, as a ban on the bringing of suit (a structure the exhaustion requirement in the law of collateral attacks never had, see Granberry v. Greer, 481 U.S. 129, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987)), which fortifies the conclusion that judges must place enforcement of the statute over a concern for efficient docket management. Defendants may waive or forfeit reliance on § 1997e(a), just as they may waive or forfeit the benefit of a statute of limitations. When they assert their rights—as the defendants in this case did—then the judge must address the subject immediately. Otherwise the benefit is likely to be lost, as it was here, for administrative and judicial claims went forward simultaneously and at the end of the judicial proceeding the judge disdained § 1997e(a). The statute can function properly only if the judge resolves disputes about its application before turning to any other issue in the suit.

Perez, 182 F.3d at 536.

Obviously, a broad reading of Perez would foreclose a court from bypassing the exhaustion issue and proceeding to dismiss on the merits, comparable to what is often done in the habeas context. And, in addition to Perez, there are other cases, that may suggest the same thing. See, e.g., Snyder v. Harris, 406 Fed. App'x 313, 316-17 (10th Cir. 2011).

More recently, the Seventh Circuit in Fluker v. County of Kankakee clarified that Perez does not prohibit a district court from reaching the merits after it has considered the exhaustion question if to do so would be in "in the interests of judicial economy and finality[.]" 741 F.3d 787, 793-94 (7th Cir. 2013) ("Fluker"). In that case, the district court concluded that the prisoner had failed to exhaust, but then, rather than dismissing the case without prejudice, the court also addressed the merits and dismissed with prejudice on that ground.

The Eighth Circuit appears to have rejected the approach taken by the Seventh Circuit in Fluker. As noted earlier, the court in at least two unpublished cases has held that dismissal with prejudice on the merits is inappropriate if it is clear there has been no exhaustion. Nevertheless, much of the reasoning that the Seventh Circuit gave for why it was appropriate in that case for the district court to proceed to the merits applies to the situation here, where further proceedings are required to resolve the exhaustion issues, the parties have litigated the merits, and the merits clearly support dismissal - a situation not addressed by the Eighth Circuit in Chelette or in the two unpublished cases of Barbee and Davis. Notably, the Seventh Circuit stated:

> The Flukers, directing us to Perez v. Wisconsin Department of Corrections, 182 F.3d 532 (7th Cir. 1999), contend the district court was precluded from rendering a decision on the merits once the Defendants raised § 1997e(a) as an affirmative defense and the court chose to grant summary judgment on that ground. In Perez, we explained that "[f]ailure to exhaust administrative remedies does not deprive a court of jurisdiction." Id. at 535. A district court can therefore decide a suit on the merits if a defendant does not raise failure to exhaust as an affirmative defense, even if the defense could have been asserted. See id. at 536. Both parties

agree with that statement. A district court, however,

> must not proceed to render a substantive decision *until* it has first considered § 1997e(a). . . . Defendants may waive or forfeit reliance on § 1997e(a), just as they may waive or forfeit the benefit of a statute of limitations. [But] [w]hen they assert their rights—as the defendants in this case did—then the judge must address the subject immediately."

Id. (emphasis added). The Flukers argue that this language establishes that the district court's opinion on the merits was an improper "advisory opinion." See generally id. ("Examining the merits first and then ordering a case dismissed on exhaustion grounds only if the plaintiff is apt to prevail . . . would border on (if it would not transgress) the rule against issuing advisory opinions."). If their contention is true, the court should not have addressed the merits, the suit should have been dismissed without prejudice, and Roy could still attempt to exhaust remedies and later re-file the case. Conversely, the Defendants contend the district court followed the quoted language and the requirements of Perez: the court *first* addressed the PLRA defense, as required, and *then* moved to the merits of the case.

As an initial matter, our holding in Perez was not that a court is *always* prohibited from addressing the merits of a suit if § 1997e(a) is raised as an affirmative defense. Rather, we simply said that § 1997e(a) "can function properly only if the judge resolves disputes about its application *before* turning to any other issue in the suit." Perez, 182 F.3d at 536 (emphasis added). The district court below did just that. And nothing in Perez, or any other case in this Circuit dealing with the PLRA or § 1997e(a), prohibits a district court's progression from the PLRA defense to the merits if the situation properly calls for it.

Here, the Defendants' summary judgment motion was fully briefed on the merits, and the Flukers had a full and fair opportunity to respond to the substance of the motions. At the time of dismissal, discovery was closed, and the court had a complete factual record and all the information needed to resolve the case on the merits. This is different than cases we have encountered where the district court did not consider the PLRA defense first or where the parties had not yet completed discovery when judgment on the merits was entered. Cf. Burrell v. Powers, 431 F.3d 282, 284-85 (7th Cir. 2005); Delgado-Brunett v. Lappin, 32 Fed.Appx. 766, 766–67 (7th Cir. 2003) (unpublished).

Accordingly, in the interests of judicial economy and finality, it made perfect sense for the district court to address the merits of the case here. See RWJ Mgmt. Co. v. BP Prods. N. Am., 672 F.3d 476, 481 (7th Cir. 2012) ("Evaluating considerations of judicial efficiency and duplication of judicial effort is not just a matter of toting up months or motions or the page counts of judicial orders. Rather, concerns about judicial economy have their greatest force when significant federal judicial resources have already been expended to decide the . . . claims, or when

there is no doubt about how those claims should be decided."). Dismissing the case without prejudice on the PLRA ground alone would have put the Defendants in a holding pattern, left to wait on the Flukers' next move without knowing if or when the suit might be reinstated—this, after almost two years of litigation and a comprehensive opportunity to address the merits of the case. That situation would not have done justice to any of the parties, especially considering that the Flukers have not (1) demonstrated that they possess additional information the district court did not consider that might support their claims, or (2) even challenged the propriety of the district court's conclusion. They only argue that the district court's decision was procedurally barred, not that the dismissal on the merits was substantively incorrect.

We are not alone in the approach taken here; other Circuits have utilized a similar approach. * * * * This is not surprising given that the primary purpose of requiring an inmate to exhaust his administrative remedies "is to 'alert [] the state' to the problem 'and invit[e] corrective action.'" Turley v. Rednour, 729 F.3d 645, 649 (7th Cir. 2013) (quoting Jones v. Bock, 549 U.S. 199, 219, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (alterations in Turley)). In cases like this, it is doubtful whether the economics and benefits of § 1997e(a) could be recognized. Roy has long since been transferred out of the Center and into the custody of the federal prison system, and the case has likewise reached its final destination—a dismissal on the merits. Section 1997e(a) helps "reduce the quantity and improve the quality of prisoner suits" by providing prison officials with the time and opportunity to address and rectify any complaints without the need for court intervention, Begolli v. Home Depot U.S.A., Inc., 701 F.3d 1158, 1161 (7th Cir. 2012) (quoting Alexander v. Gardner-Denver Co., 415 U.S. 36, 47-49, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974)), rather than having a jail matter potentially resolved by a fact finder who is unfamiliar with prison practices and procedures. But the opportunity for that to apply here has passed, and it is impossible to reset the case to its starting point. As such, to dismiss the case without prejudice now, only to provide Roy with an opportunity to exhaust his remedies (which might not even be possible), would contravene the purpose of § 1997e(a).

Fluker, 741 F.3d at 792-94 (italics in original) (footnote omitted).

While the Seventh Circuit in Fluker did not address the propriety of a district court proceeding to the merits in situations like this case, where further proceedings are required to resolve the exhaustion issues and the merits have been litigated, at least one Seventh Circuit district court has read Fluker to permit dismissal on the merits without first resolving the exhaustion issues. E.g.,

Boyce v. Carter, No. 12 C 5372, 2014 WL 4436384, at *10 (N.D. Ill. Sept. 8, 2014) ("Accordingly,

to conserve the resources of the Court and the parties and to achieve finality, the Court will reach the merits of Boyce's remaining claims against Dr. Mitchell and Dr. Brown based on dental care they provided, and will not delve into the parties' arguments about whether Boyce exhausted these claims.  See Fluker, 741 F.3d at 792-93.").[10]

Even more instructive is the First Circuit's decision in Ramos v. Patnaude, 640 F.3d 485 (1st Cir. 2011).  In that case, the district court found for the defendants on the defense of failure to exhaust, but further considered and held for the defendants on the merits of the due process claims for alleged reckless indifference to medical needs.  In an opinion authored by retired Supreme Court Justice Souter sitting by designation, the court concluded it was appropriate in that case to bypass consideration of the exhaustion issues, which had been resolved by the district court in favor of the defendants, and affirm the district court's dismissal on the merits.  After noting why certain defendants in that case had fallen by the wayside, the court stated:

> The issues, too, are subject to reduction, beginning with one alternative ground for judgment, the failure to exhaust administrative remedies, which is the subject of a substantial portion of the briefing before us.  So far as it concerns the federal claim, satisfaction of the exhaustion requirement of § 1997e(a) turns on whether prisoners at the House of Correction were on notice that complaints about denial of access to medical care were subject to the administrative grievance procedure (as distinct from complaints about the merit of medical care actually rendered, which clearly are not), and on whether Ramos's claims here are about denial of access rather than the quality of treatment.  Ramos argues, with color of support, that no such grievance opportunity was made known, and thus aims at reversing both the adverse ruling on exhaustion, and (if he succeeds on that) at vacating the equally adverse rulings on the merits, which he says were beyond the district court's jurisdiction once it held Ramos had failed to exhaust.  The appellees counter that failure to exhaust was the correct conclusion, but that the merits ruling was independently within the trial court's power, since exhaustion is not a jurisdictional requirement.

---

[10]  The Seventh Circuit in Fluker did cite the language of Perez about the statute functioning properly only if the exhaustion defense is resolved prior to turning to any other issue in the suit, so there remains the possibility that Fluker may be limited to the situation where a district court has also addressed the exhaustion issue.

We take a third position, for economy of disposition, in choosing to bypass the exhaustion issue just because it is not jurisdictional, and because the merits decision is sound, as we will explain. The Supreme Court made it plain in <u>Woodford v. Ngo</u>, 548 U.S. 81, 101, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), that exhaustion under § 1997e(a) is not a jurisdictional condition, and has held it to be an affirmative defense, <u>Jones v. Bock</u>, 549 U.S. 199, 212, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Ramos tries to deflect <u>Ngo</u> by pointing out, perplexingly, that the Court there was speaking only of what it called "proper" exhaustion. But the Court used that adjective simply to describe the action that would qualify as exhaustion, to distinguish it from resort to administrative process after the time allowed: a claim barred by time is not "exhausted" by raising it late. <u>See</u> <u>Ngo</u> 548 U.S. at 90-93, 126 S.Ct. 2378. *So, even on the assumption that Ramos failed to exhaust a House of Correction's grievance procedure that had been made known to him, the district court had, and this court has, jurisdiction to reach the merits.* Our choice to consider the merits without working through the exhaustion issue eliminates the further assignment of error that before acting on the summary judgment motions the district court unreasonably denied Ramos further time (requested under Fed.R.Civ.P. 56(f)) to depose a corrections officer, Sgt. Germano, on the scope of the subject matter of possible administrative grievance.

<u>Id.</u> at 488-89 (italics added).

The Third Circuit appears to have taken a similar approach in <u>Wishnefsky v. Salameh</u>, 445 Fed. App'x 545 (3d Cir. 2011) (unpublished per curiam). In that case, the district court dismissed with prejudice based on failure to exhaust and procedural default, but the Third Circuit affirmed the dismissal based on the merits and did not address the exhaustion issues.

Finally, the Ninth Circuit most recently in <u>Albino v. Baca</u>, 747 F.3d 1162 (9th Cir. 2014) addressed in an *en banc* opinion the procedures that should be followed when addressing the exhaustion question. And, in so doing, the court stated in part that: "Exhaustion should be decided, *if feasible*, before reaching the merits of a prisoner's claim." <u>Id.</u> at 1170 (italics added). In addition, the court stated that a motion for summary judgment could be made by either party to address the exhaustion issues and that it "may be, but need not be, directed solely to the issue of exhaustion." <u>Id.</u> In other words, the Ninth Circuit appears to have recognized that there may be instances when

the merits can be resolved without first addressing the exhaustion issues.

In this case, like in <u>Fluker</u>, the parties have litigated and briefed the merits despite both having had the opportunity to seek a ruling on the exhaustion defense before doing so. And, since the defense is not jurisdictional and can be waived or not even asserted, it would seem that no great damage is done by giving effect to the parties' litigation choices in this instance.

This is particularly true for Ward County, for whom the defense was primarily intended to benefit. <u>See</u> <u>Ngo</u>, 548 U.S. at 88-90. Although Ward County raised the defense in its answer, it did not assert it in its first motion for summary judgment. Rather, it was not until after first doing its own merits discovery and responding to Benjamin's, that it raised the issue in its renewed motion, and, even then, addressed the merits first and perfunctorily addressed the claimed lack of exhaustion at the end - seemly as an alternative grounds for dismissal. If Ward County can waive the defense altogether, presumably it can also waive any lesser right or entitlement to have the exhaustion defense resolved first or even now in conjunction with the merits determination it seeks.

Moreover, proceeding to resolve the merits issues now without first resolving the exhaustion issue promotes judicial economy in this instance. By doing so, the court and the parties avoid the additional proceedings that the court has determined are required to completely resolve the exhaustion issues, which likely have been made more difficult given the passage of time consumed by the parties addressing the merits.

Also, proceeding now to dispose of the case on the merits provides finality - at least assuming the court is correct as to the merits. But that very well may not be the case if, after further proceedings and briefing on the exhaustion issues, the court concludes there was a failure to exhaust and the case is dismissed without prejudice as required by Eighth Circuit precedent. This is because

the Jail's grievance policy imposed no time limits upon Benjamin[11] and the statute limitations with respect to any new action in this court probably has not run, even assuming no grounds for tolling.[12] In other words, if the case is dismissed without prejudice on failure to exhaust grounds, Benjamin could attempt to exhaust, and successful or not, file a new action here with possibly even more exhaustion issues to be resolved. In the meantime, the fundamental problem Benjamin has with respect to his case against Ward County in terms of the merits will have not changed one iota.

While the Eighth Circuit did state in Chelette that the district court was obligated in that case to consider the exhaustion defense when it was raised, the circumstances were much different. In that case, the defendant immediately presented the exhaustion issue to the district court in a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction and the district court concluded the prisoner had adequately exhausted the administrative remedies and denied the motion. 229 F.3d at 686. The defendant then took an interlocutory appeal based upon a certification issued by the district court pursuant to 28 U.S.C. § 1292(b). Id. In reaching the conclusion that the district court had erred and that the case should have been dismissed for failure to exhaust, the Eighth Circuit paused to consider whether the defense was jurisdictional and whether the district court properly

---

[11]   Even if it appeared that Benjamin would no longer be entitled to exhaust his administrative remedies, dismissal solely on the grounds of failure to exhaust may still have to be without prejudice in that the courts are split on the issue of whether dismissal with prejudice is appropriate if it appears to the court that the administrative remedies have been procedurally defaulted, comparable to what occurs in the habeas context. Compare, e.g., Fluker, 741 F.3d at 791 ("We have held that dismissals under § 1997e(a) for failure to exhaust must be without prejudice. [citation omitted]. This is true even if exhausting administrative remedies will prove to be impossible . . . ."), with Berry v. Kerik, 366 F.3d 85, 88 (2d Cir. 2004). The court is not aware of any Eighth Circuit case that has decided the issue and there are conflicting district court opinions within the Circuit. Compare Reed v. Anderson, No. 5:11-cv-111, 2011 WL 4709884, at *2 & n.1 (E.D. Ark. Sept. 9, 2011) report and recommendation adopted 2011 WL 4736971, with Brooks v. Roy, No. 12-cv-316, 2014 WL 127024, at *20 n.7 (D. Minn. Jan. 14, 2014), and Parks v. Dooley, 2011 WL 847011, at *18.

[12]   The statute of limitations for a § 1983 action in this district is six years. Rheault v. City of Fargo, No. 3:12-cv-21, 2013 WL 3229909, at *7 (D.N.D. June 25, 2013); Carpenter v. Williams County, N.D., 618 F. Supp 1293 (D.N.D. 1985).

addressed the defense when it did.  Id. at 686-88.  After concluding the defense was not jurisdictional, the court then made the statement about the district court being obligated to consider the defense when it is raised, but, arguably, this was in the context of explaining that the court had acted properly in addressing the motion even though nominally made pursuant to Rule 12(b)(1) and not a general pronouncement that this would have to be done in every case.  Id.

Notably, the parties had not litigated the merits in Chelette, so the court did not have to address when, if ever, it would be appropriate to address the merits when the defense of failure to exhaust has been raised.  Further, even though the court cited Perez in making its statement that the district court was obligated to consider the exhaustion defense, there is nothing to indicate that by doing so it was buying into everything that the Seventh Circuit either held or suggested may be required.

Likewise, the Eighth Circuit did not address the court's obligations with respect to the exhaustion defense in situations like this case in either of the two unpublished per curiam decisions in  Barbee and Davis.  That is, the court did not say in either case that a district court was required to *resolve* the exhaustion issues before proceeding to the merits in every case.  Rather, whether intentional or not, the decisions were limited to holding that, when the failure to exhaust has been demonstrated or is obvious, dismissal must be without prejudice.  Barbee, 394 Fed. App'x at 338 ("Once the court determined that the claims were unexhausted, it was required to dismiss them without prejudice."); Davis, 389 Fed. App'x at 587-88 ("The defendants raised as an affirmative defense the fact that Davis failed to exhaust his administrative remedies and there was undisputed evidence that Davis did not appeal the denial of the two grievances he filed at the Eastern Arkansas Regional Unit concerning the matters at issue here.  Dismissal without prejudice was therefore

mandatory.").

Further, the two cases cited in both Barbee and Davis in support of the holdings are also not on point. One of the cited cases was Johnson v. Jones, 340 F.3d 624 (8th Cir. 2003). The issue in that case was whether exhaustion was required where the claims had not been exhausted as of the time of the filing of the complaint but were exhausted by the time the district court considered the motion to dismiss for failure to exhaust. The Eighth Circuit concluded that the claims had to be exhausted as of the time of the filing of the case but excused the plaintiffs from doing so in that case because it was the first panel of the Eighth Circuit to reach that conclusion. Relevant here is the fact that no mention was made of what is required in the situation where further proceedings are required to determine the exhaustion issue, the parties have litigated the merits, and the merits clearly warrant dismissal.

The other case cited in both Barbee and Davis is the Eighth Circuit's *en banc* opinion in Lyon addressed earlier. In Barbee, the court noted that dismissal of the complaint was required in Lyon, even though the case had gone to trial, because the prisoner had failed to exhaust and the defendants had not waived the defense. 394 Fed. App'x at 338. But Lyon also presented a different situation from that which the court confronts in this case. In Lyon, defendants timely raised the exhaustion issue, the district court concluded the failure to exhaust was excused, and the case went to trial with the prisoner prevailing on the merits. The principal differences here are twofold. First, while Ward County asserted the failure-to-exhaust defense in its answer, it was less than diligent in pursuing the defense thereafter. That was not the case in Lyon. Second, this case can be dismissed on the merits without further proceedings in favor of the party asserting the exhaustion defense, *i.e.* Ward County. This was not possible in Lyon.

In short, none of the Eighth Circuit cases the court has reviewed to this point appear to directly prohibit the court from proceeding to address the merits given the circumstances. Notably, at least one other district court in this Circuit has apparently come to the same conclusion. It likewise has bypassed the exhaustion issues for purposes of judicial economy in at least two cases and dismissed them on the merits with prejudice. In fact, one of the cases was summarily affirmed by the Eighth Circuit in an unpublished per curiam decision, albeit without mention that the district court had bypassed the exhaustion defense. Anderson v. United States, No. 11-1486, 2013 WL 1173948, at *7 n.12 (D. Minn. Jan. 25, 2013), report and recommendation adopted 2013 WL 1173901 (Mar. 20, 2013), affirmed 564 Fed. App'x 865 (8th Cir. May 7, 2014) ( "[W]e conclude that the district court properly granted summary judgment for the reasons explained in the thorough report and recommendation that the court adopted."); Jones v. Harcey, No. 11-616, 2012 WL 2884920, at *4 n.2 (D. Minn. Feb. 9, 2012), report and recommendation adopted 2012 WL 2885114 (July 13, 2012).

Turning finally to the language of § 1997e(a), while it does use the words "*[n]o action shall brought . . .* until such administrative remedies as are available are exhausted" [italics added], the Supreme Court has concluded in the cases cited earlier that the defense is not jurisdictional, it is an affirmative defense, and that the defense can be waived or not asserted at all. In fact, the Supreme Court pointed out in Jones that Congress frequently has used the "no action shall be brought" type of language in statutes prescribing limitation periods.[13] Jones, 549 U.S. at 220. Granted the

---

[13] There is no rule this court is aware of that requires resolution of a statute-of-limitations defense before entering judgment in favor of a party asserting a defense on other grounds. Cf. Minnesota ex rel. Northern Pacific Center v. BNSF Railway Co., 686 F.3d 567, 575 (8th Cir. 2012) (because the court affirmed the grant of summary judgment to defendant on the merits, it dismissed as moot defendant's cross-appeal of the district court's denial of summary judgment on statute of limitations grounds).

exhaustion defense is different, but the point is that § 1997e(a), as construed by the Supreme Court, does not require resolution of the exhaustion defense in all cases before a merits determination can be made, which appears to be the point retired Justice Souter was making in Ramos.

Also, the fact that § 1997e(c)(1) specifically authorizes dismissal without first requiring exhaustion when the claims on their face are frivolous, malicious, fail to state a claim for relief, or seek monetary relief from an immune defendant does not necessarily mean that exhaustion is required in all other instances. Again, the Supreme Court has concluded the defense does not have to be asserted and can be waived. Further, the language of § 1997e(c)(1) can be read as simply making clear that exhaustion does not have to be a consideration for the early screening required by 28 U.S.C. § 1915A without necessarily implying more.

Likewise, it may be reading too much into the statute to conclude that the absence of a provision comparable to 28 U.S.C. § 2254(b)(2), which explicitly authorizes the bypass of exhaustion requirements in habeas cases when the petition can be dismissed on the merits, implies that this could not be done in PLRA cases.

Finally, the spirit of the PLRA supports the court being able in appropriate cases to bypass resolution of the exhaustion issues and dismiss on the merits when that result would otherwise plainly be required. One of the primary purposes of the PLRA was to lessen the burden on the federal judiciary. Requiring courts to resolve difficult fact-laden exhaustion questions before turning to much clearer merits issues that otherwise require dismissal, and then requiring dismissal without prejudice if there has not been exhaustion creating the possibility of more litigation, hardly advances that goal.

In this case, the court has not ignored the exhaustion defense. Rather, it has considered the

defense first and concluded that further proceedings are required to resolve the exhaustion issues. And, since neither party raised the exhaustion issue before and both have litigated and briefed the merits, the court concludes it is appropriate not only because of the litigation choices that have been made but also for purposes of judicial economy and finality to proceed to dismiss Benjamin's claims on the merits without first resolving the exhaustion issues.

## V.    THE MERITS

As recently explained by the Eighth Circuit in Johnson v. Douglas County Medical Dept., 725 F.3d 825 (8th Cir. 2013) ("Johnson"), a political subdivision does not have *respondeat superior* liability for torts committed by its agents. Rather, in keeping with the purposes of § 1983, the liability of a political subdivision is more limited to where the constitutional violation is the result of a policy, custom, or official action of the political subdivision. The Eighth Circuit explained:

> "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). Johnson seeks to impose municipal liability on the County through § 1983 for the allegedly unconstitutional actions of its agents in depriving him of his anti-seizure medication. "[I]t is well established 'that a municipality cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor.'" Atkinson, 709 F.3d at 1214 (quoting Szabla v. City of Brooklyn Park, Minn., 486 F.3d 385, 389 (8th Cir. 2007)). However,
>> [l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, . . . local governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels.
>
> Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Id. at 828.

In this case, it appears the policymaking for the Ward County Jail rests with the County Commission or possibly, for some things, the sheriff or the person identified in defendant's discovery responses as Steven P. Kukowski, the Jail administrator. (Doc. No. 54-1, p. 2). With respect to any of these possible policymakers, Benjamin has failed to establish that the purported violations of his constitutional rights were the result of any of their official acts, policies, or customs. See, e.g., Jenkins v. County of Hennepin, Minn., 557 F.3d 628, 633 (8th Cir. 2009) (evidence insufficient to establish that policy was inadequate). In fact, it appears the medical services and communicable disease policies adopted by the Ward County Commission addressed what Benjamin complains about and that the problem in this case was the failure of Jail personnel to follow established policies.

This leaves then the question of whether any constitutional violation that may have occurred was the result of a Ward County custom, which could include a continuing and widespread failure to follow established policies. To prove a claim for liability based upon custom, a plaintiff must show:

> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> 3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

Johnson, 725 F.3d at 828 (quoting authority omitted).

In this case, Benjamin makes two arguments in support of liability based upon custom. The first is that the evidence of multiple acts of misconduct on the part of Ward County Jail personnel

involving him creates a fact issue with respect to whether or not the custom of Ward County was to treat prisoners as cavalierly as the evidence suggests the Jail personnel did in this case - at least when it comes to dealing with MRSA. The multiple failures that Benjamin points to fall into three categories. The first relates to the alleged failure to provide him prompt medical care after he requested it and, instead, making him wait to sick call. The second is the evidence of multiple acts of non-compliance with the Jail's communicable disease policy when Jail personnel returned him to his cell after the first surgery. The third is the failure on successive days over a weekend to take Benjamin where he needed to go for a change of the dressing on his knee.

While there may be certain cases where multiple acts taken with respect to a specific individual could be evidence of "a continuing, widespread, persistent pattern of unconstitutional misconduct" sufficient for a jury to conclude the first element required by Johnson had been satisfied, that is not the case here since all of the acts in question occurred within a relatively short span of time.[14] See Johnson, 725 F.3d at 828-29 (recognizing that multiple incidents involving a single plaintiff could establish custom if the incidents occurred over a sufficiently long period of time to permit notice of and then deliberate indifference or tacit authorization, but concluding there was not sufficient evidence in that case to present a jury question); Fromer v. Corizon, Inc., __ F. Supp. 3d __, 2014 WL 5308089, at *11 (S.D. Ind. Oct. 15, 2014) (concluding in a MRSA case that plaintiff could not rely upon his own circumstances to make the requisite showing).

---

[14] This assumes the evidence of the first act of alleged misconduct should be counted, which is highly doubtful. Based on what Benjamin contemporaneously reported to Jail officials when completing the request for medical care form, it would be difficult to conclude that requiring him to wait until sick call amounted to "deliberate indifference" given the lack of indication that his condition was serious enough to require immediate treatment. Further, even though Benjamin's condition may have worsened to a degree after he made his request for medical care, the evidence is thin with respect to whether he thereafter complained about it. Moreover, he was promptly taken to the emergency room when he was seen by a doctor on sick call and this was within a day or so of the time that his condition may have worsened.

Benjamin's second argument for liability based on custom is that discovery uncovered the fact that Ward County had several prior instances of prisoners with MRSA and that Ward County's discovery response indicating those situations were addressed by dressing changes further supports a custom of inadequately addressing prisoners with this communicable disease. The several instances identified by Ward County, however, were different and the evidence of how those prisoners were handled is too uncertain to determine whether any violation of the Jail's communicable disease policy or other misconduct occurred, much less something happening that would have put the Ward County final decision-makers on notice of the violations or other misconduct.

In short, Benjamin has failed to come forward with sufficient proof that his alleged injuries were the result of some official act, policy, or custom on the part of Ward County that would permit submitting his claims to a jury. Consequently, the case will be dismissed with prejudice on that basis.[15]

## VI.   <u>ORDER</u>

Based on the foregoing, it is hereby ordered as follows:

1.      The caption of this case shall be changed to that as set forth above, which has deleted

---

[15] Even if the court concluded otherwise, Benjamin would face difficult and, perhaps insurmountable, problems in proving causation with respect to his claim that Ward County did not do enough when he was returned to his cell following his first surgery, which, arguably, has more traction than his claim of deliberate indifference with respect to not being afforded medical care prior to sick call. The causation hurdle (at least for collection of any significant damages) is Benjamin being able to prove that the claimed failures to properly clean his cell and bedding and the failure on the two successive days to take him for a change of the dressing on his knee actually resulted in the MRSA returning, the need for the second surgery, and any other resulting injury. While there is a medical record which suggests that Benjamin's treating doctor believed the MRSA had abated during his course of treatment after he was returned to the Jail, it may be difficult to prove that, in fact, this was the case since there is no evidence of any cultures being taken at that point (it appears the doctor reached his conclusion simply by looking at the wound) and since a qualified expert may have to concede that the MRSA may never have been completely eradicated and that it simply came back with force after the prescribed two-week course of antibiotics ended, which was while he was still at the Jail.

the previous reference to a "John Doe" defendant.

2.  Defendant's renewed motion for summary judgment (Doc. No. 92) is **GRANTED**

and the above action is dismissed with prejudice.

**IT IS SO ORDERED.**

Dated this 18th day of March, 2015.

_/s/ Charles S. Miller, Jr._
Charles S. Miller, Jr.
United States Magistrate Judge